# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**DONNA ANN SEAMAN**,
as Personal Representative of
the Estate of Shaun Seaman,

     Plaintiff,

v.                                                                            Case No. 8:23-cv-1060-WFJ-NHA

**DETENTION DEPUTY MARC
FLEURJEAN**, individually;
**DETENTION DEPUTY JONATHAN
MORALES**, individually;
**DETENTION DEPUTY CHRISTOPHER
COVEY**, individually;
**DETENTION DEPUTY JESSE
LOVELACE**, individually;
**DETENTION DEPUTY JASON
FAIN**, individually;
**DETENTION DEPUTY JOHN
VIVIANO**, individually;
**DETENTION DEPUTY RONALD
HENSLEY**, individually;
**SHERIFF GRADY JUDD**,
official capacity;
**LYNN BROOM, RN**,
individually;
**CORIZON HEALTH**,

     Defendants.

_____/

# ORDER

Before the Court are Defendants Marc Fleurjean, Jonathan Morales, Christopher Covey, Jesse Lovelace, Jason Fain, John Viviano, Ronald Hensley (the "Detention Deputies"), and Sheriff Grady Judd's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. Dkt. 84. Plaintiff Donna Seaman, as Personal Representative of the Estate of Shaun Seaman, has filed a response in opposition, Dkt. 91, and Defendants replied. Dkt. 95.[1] Upon careful consideration, the Court grants in part and denies in part Defendants' Motion for Summary Judgment.

## BACKGROUND[2]

This case arises out of the death of Shaun Seaman at the Polk County Jail. *See generally* Dkt. 1. On May 12, 2021, the Polk County Sheriff's Department took Mr. Seaman into administrative confinement and placed him on suicide watch in the S-Medical Building of the South County Jail ("S-Med"). Dkt. 1 ¶ 27. On May 13, 2021, Mr. Seaman was roomed with three other inmates in "ISO-2": John Smith, Sean Collins, and Daniel Glanton. Dkt. 83 ¶ 1. The Polk County Sheriff's Office Suicide Watch Policy (the "Suicide Watch Policy") requires that inmates in S-Med must "be

---

[1] Plaintiff also filed a Motion to Strike or Limit Opinion Testimony of defense expert Dr. Richard Hough. Dkt. 68. This Order neither addresses Plaintiff's motion to strike nor relies on Dr. Hough's expert report.

[2] The relevant facts are derived from Defendants' Statement of Undisputed Facts, Plaintiff's Response to the Statement of Undisputed Facts, and the record in this case. *See generally* Dkt. 83; Dkt. 92. When evaluating the Motion for Summary Judgment, the Court construes the facts in the light most favorable to Plaintiff, the nonmoving party. *See* Fed. R. Civ. P. 56; *Jacoby v. Baldwin County*, 835 F.3d 1338, 1342 (11th Cir. 2016) (citation omitted).

observed every fifteen (15) minutes either continuously or at irregular intervals not to exceed fifteen (15) minutes by the detention staff" and that these observations be logged. Dkt. 91-13 at 2.

On May 13, at approximately 3:10 or 3:15 PM, detention staff began distributing medication to inmates in S-Med. Dkt. 83 ¶ 3; Dkt. 82 at 34:12-25. Around this time, Smith and Collins got into a physical altercation, with Smith violently attacking Collins and standing on his neck. Dkt. 83 ¶ 5; Dkt. 91-15 (showing May 13, 2021, incident report). Following this altercation, Collins was immediately removed from ISO-2 and placed into ISO-1. Dkt. 83 ¶ 7. Smith remained in ISO-2 with Mr. Seaman and Glanton while the detention staff finished the "med pass."[3] *Id.* Around 10-15 minutes later, after the med pass was complete, detention staff removed John Smith from ISO-2 and placed him into ISO-4 by himself. *Id.* at ¶ 8; Dkt. 92 ¶ 27. It is during this 10-15 minute window that Smith severely beat Mr. Seaman, resulting in blunt force trauma to his head, a skull fracture, and multiple brain contusions. Dkt. 91-11 at 1; Dkt. 1 ¶¶ 34, 40. Four hours later, at approximately 7:40 PM, detention staff finally discovered that Seaman was unresponsive and unconscious. Dkt. 83 ¶ 25. Mr. Seaman was subsequently

---

[3]. "Med pass" refers to the process by which medical staff and detention deputies distribute medicine to inmates in S-Med. Dkt. 82 at 35:4-8.

transported to a hospital, where he succumbed to his injuries approximately one week later on May 21, 2021. Dkt. 91-11 at 1; Dkt. 1 ¶ 40.

## I.    The Relevant Actors

### a. Defendant Marc Fleurjean

Defendant Marc Fleurjean is a detention deputy currently employed by the Polk County Sheriff's Office, having recently been promoted to the rank of sergeant. Dkt. 83 ¶ 22. Fleurjean has worked for the Polk County Sheriff's Office since June 19, 2017. *Id.* Fleurjean was assigned to S-Med on May 12-13, 2021, for the overnight shift from 6:00 PM to 6:00 AM. *Id.*; Dkt. 80 at 11:17-12:3, 17:23-25. Fleurjean's only interaction with Mr. Seaman is that Mr. Seaman and Collins were housed in S-Med during Fleurjean's overnight shift. Dkt. 80 at 18:1-24. However, when conducting his 15-minute rounds, Fleurjean did not recall observing Mr. Seaman since another detention deputy could have been using his ID number when logging observations of inmates in S-Med. *Id.* at 20:18-21:6.[4]

At the time of Smith's fatal attack on May 13, 2021, Fleurjean had already finished his overnight shift and was not on duty. *Id.* at 11:17-12:3, 36:14-37:2. Fleurjean worked another overnight shift on May 13-14, 2021, from 6:00 PM to 6:00

---

[4] In Defendant Fleurjean's deposition, he explains that the 15-minute observation for inmates on suicide watch is done on handheld devices that scan a tag on each ISO cell. Dkt. 80 at 19:17-25. Per Polk County Sheriff's Office policy, each detention deputy is required to log in to these handheld devices with their own ID before conducting their rounds; however, deputies often use the handheld scanner without logging the previous deputy off. *Id.* at 20:21-22:7. As such, the observation log may list the ID of a deputy who did not conduct the observation. *Id.*; *see also* Dkt. 82 at 58:3-14 (deposition of John Viviano discussing the same issue of deputies not logging themselves out of the handheld devices).

AM in another part of the South County Jail. *Id.* at 37:9-21. Fleurjean never went to S-Med following Smith's attack on Mr. Seaman, participated in any subsequent investigation, or wrote a report about the incident. *Id.* at 39:10-19.

### b. *Defendants John Viviano and Jonathan Morales*

Defendant John Viviano was a detention deputy employed by the Polk County Sheriff's Office from 2017 to 2022. Dkt. 82 at 9:3-8. Defendant Jonathan Morales is a detention deputy currently employed by the Polk County Sheriff's Office. Dkt. 91-3 at 9:14-18. On May 13, 2021, Viviano and Morales worked the 6:00 AM to 6:00 PM shift and were assigned to inmate movement that day. Dkt. 82 at 15:9-21, 27:3-25; Dkt. 91-3 at 28:19-29:4. At approximately 3:00 PM, Viviano's assignment was changed to relieve a deputy in S-Med. Dkt. 82 at 28:1-19, 31:4-9. Because Viviano was training Morales that shift, Morales accompanied Viviano to S-Med following the change in assignment. *Id.* at 28:20-25; Dkt. 91-3 at 29:3-21, 31:3-24. When Viviano and Morales arrived at S-Med, Defendant Jason Fain was the only other deputy on duty. Dkt. 82 at 32:9-14.

Around 10-15 minutes after arriving at S-Med, Viviano and Morales accompanied Nurse Lynn Broom as she began conducting the med pass. Dkt. 82 at 34:10-25; Dkt. 91-3 at 34:15-35:16. While Viviano was collecting the medicine cups from ISO-1, Nurse Broom and Morales moved on to ISO-2, where the physical altercation with inmates Smith and Collins was ongoing. Dkt. 82 at 35:12-23; Dkt.

91-3 at 36:3-25. Morales moved to intervene after spotting Smith standing on Collins' neck. Dkt. 91-3 at 36:3-37:19, 40:5-41:11. When entering ISO-2 to break up the fight, Morales recalls inmate Glanton standing off to the side and Mr. Seaman lying down under a blanket. *Id.* at 41:12-42:12. After arriving at ISO-2, Viviano also recalls Glanton standing up and Mr. Seaman lying down. Dkt. 82 at 36:13-24. After having Nurse Broom medically access Collins, Morales and Viviano moved Collins to ISO-2 with the assistance of Defendant Fain. *Id.* at 38:23-39:14; Dkt. 91-3 at 42:13-44:4. A supervisor was informed of the incident between Collins and Smith. Dkt. 82 at 43:12-44:14. Viviano and Morales then continued the med pass for the rest of S-Med. *Id.* at 40:25-41:8. This took approximately 10-15 minutes. *Id.* Viviano recalls that Smith was not immediately removed from ISO-2 since he was compliant and showed no signs of aggression. *Id.* at 39:19-24; 108:22-109:7.

After completing the med pass, Viviano and Morales returned to the ISO-2 to remove Smith and put him into ISO-4 alone. *Id.* at 41:5-42:20, 44:18-45:4. Viviano and Morales did not check on or speak with Mr. Seaman or Glanton after Smith's removal from ISO-2. *Id.* at 46:10-24; Dkt. 91-3 at 48:2-18. Morales did not notice any blood on the floor of ISO-2, was not told that Mr. Seaman was hurt by Nurse Broom or Glanton, and did not hear anyone crying out in pain. Dkt. 91-3 at 72:10-73:9. Viviano also does not recall Mr. Seaman calling for help, did not hear anyone else in the cell cry for help, and does not remember seeing any blood on the

6

floor. Dkt. 82 at 109:8-110:22. However, Viviano testified that nothing was preventing him from stopping the med pass to check on Mr. Seaman. *Id.* at 48:16-19. Viviano ended his shift early at 5:00 PM and was relieved by Defendant Ronald Hensley. *Id.* at 50:12-21. At the same time, Morales was reassigned back to inmate movement and left S-Med. Dkt. 91-3 at 51:5-12.

### c. Defendant Jason Fain

The Polk County Sheriff's Office has employed Defendant Jason Fain as a detention deputy since 2017 or 2018. Dkt. 83 ¶ 24. Fain was on shift on May 13, 2021, from 6:00 AM to 6:00 PM. Dkt. 77 at 35:15-20. On that day, Fain was assigned with Hensley and Deputy Medina in S-Med. *Id.* The detention deputies, along with the nursing staff, were responsible for the inmates in ISO-2. Dkt. 83 ¶ 24. Later in the shift, Deputy Medina left S-Med and was relieved by Viviano and trainee Morales. *Id.*; Dkt. 77 at 46:9-47:7. The only contact Fain may have had with Mr. Seaman on May 12 or 13, 2021, was placing him in ISO-2, although he does not remember if he was the deputy who did so or not. Dkt. 83 ¶ 24.

Following the arrival of Viviano and Morales, Fain began distributing meals, while the other two deputies started the med pass with Nurse Broom. Dkt. 77 at 49:16-50:13. However, right before the meal distribution began, Fain went over to ISO-2 to assist Morales with breaking up the Smith/Collins fight after overhearing shouting. *Id.* at 50:8-51:23. Fain assisted Morales in moving Collins out of ISO-2 to

get evaluated by Nurse Broom. *Id.* at 51:10-52:24. Fain recalls that Smith was not immediately removed from ISO-2 since "the situation was under control." *Id.* at 53:16-54:19. Fain also testified that no other deputies in S-Med observed Smith assault Mr. Seaman. *Id.* at 56:1-10. Additionally, Fain did not call for backup because everything appeared to be under control once they separated Smith and Collins. Dkt. 83 ¶ 16. While Fain could have checked up on Mr. Seaman or Glanton, he did not do so because the incident had been between Smith and Collins, and it had been resolved. *Id.* Fain also recalls Smith being compliant and not attacking any other inmates or deputies. Dkt. 77 at 86:1-87:5.

Following the altercation and Smith's removal from ISO-2, Fain resumed distributing meals. *Id.* at 56:15-22. Fain passed out food trays to ISO-2 when only Mr. Seaman and Glanton were left in the cell. Dkt. 83 ¶ 12. He does not remember Mr. Seaman acknowledging the food tray or eating, although it is not odd for an inmate to ignore a detention deputy passing out food. *Id.* Nor does Fain recall seeing any blood or anything abnormal about Mr. Seaman as he lay on the floor of the cell. *Id.* ¶ 17.

> d. *Defendant Ronald Hensley*

The Polk County Sheriff's Office has employed Defendant Ronald Hensley as a detention deputy since August 2005. Dkt. 83 ¶ 21. Hensley worked the 6:00 AM to 6:00 PM shift on May 13, 2021. Dkt. 79 at 53:11-15. Initially, Hensley was

assigned to S-Med but was reassigned to "Building 7" for a couple of hours at around 12:30 PM. *Id.* at 65:3-66:18. Hensley returned to S-Med at around 4:00 PM to relieve Defendant Viviano, who was leaving early. *Id.*; Dkt. 83 ¶ 14. While Hensley was not present during Smith and Collin's physical altercation, Defendant Viviano briefed Hensley on the incident when he came back to S-Med at around 4:00 PM. Dkt. 79 at 68:5-22. By the time Hensley arrived at S-Med, Collins and Smith were already separated and removed from ISO-2. *Id.* at 69:3-24.

However, Hensley had prior dealings with Smith. *Id.* at 32:3-34:23. Hensley had authored two incident reports involving Smith fighting with other inmates, one dated May 4, 2021, and the other on May 12, 2021. *Id.*; *see* Dkt. 91-8; Dkt. 91-9. Additionally, in the early morning hours of May 13, Collins reported to Hensley that another inmate (allegedly Smith) had punched him during the 6:30 AM shower time. Dkt. 79 at 57:11-58:12. Upon investigation, Hensley dismissed Collins' complaint since Smith was not housed in the same cell as Collins at the time. *Id.* at 57:11-60:25. Collins provided a recorded statement in which he stated that he was punched in the face in the morning by John Smith on May 13, 2021, and reported this incident to the detention deputies. Dkt. 92 ¶ 9; *see* Dkt. 96 at 7:20.

### e. Defendants Christopher Covey and Jesse Lovelace

Defendant Jesse Lovelace is a detention deputy employed by the Polk County Sheriff's Office since 2019. Dkt. 91-1 at 8:22-9:8. Defendant Christopher Covey is

a former detention deputy who the Polk County Sheriff's Office employed until his departure to become an electrician. Dkt. 91-2 at 10:5-11:1. Both Lovelace and Covey worked the 6:00 PM to 6:00 AM overnight shift in S-Med on May 13-14, 2021. Dkt. 91-1 at 38:7-23; Dkt. 91-2 at 30:23-31:3. At the beginning of their shift, Lovelace and Covey were briefed about the incident between Inmates Smith and Collins, and both inmates had already been removed from ISO-2. Dkt. 91-1 at 29:10-30:2; Dkt. 91-2 at 25:9-22. By the time Lovelace went on duty, Smith had already been removed from S-Med, and Collins was still in ISO-1. Dkt. 91-1 at 43:3-11. During the continuous 15-minute observation checks of the "front [ISO] cells" in S-Med, Lovelace only recalls that Mr. Seaman was lying down under the green blanket. Dkt. 91-1 at 47:6-50:15. Lovelace also did not remember seeing any blood in ISO-2 during his check, but testified he would have entered the cell to check up on Mr. Seaman if he had seen blood. *Id*. at 82:3-10, 94:20-95:1. Covey was only doing 15-minute checks on the "back [ISO] cells" (i.e., not ISO-2 where Mr. Seaman was being held) since he was also handling transfer paperwork for inmates who were being pulled off suicide watch and being transferred back to the general population. Dkt. 91-2 at 41:3-21.

At approximately 7:30 PM, Lovelace and Covey were "clear[ing] off" S-Med by transferring the inmates back to the general population buildings. Dkt. 91-1 at 62:9-66:20. When Mr. Seaman failed to respond to Covey's command, he asked

10

Glanton to wake Mr. Seaman up. *Id.*; Dkt. 91-2 at 45:17-47:7. When Glanton went
to check up on Mr. Seaman and moved his arm, Covey noticed some blood on the
floor around his head. Dkt. 91-2 at 45:17-47:7. Covey then approached Mr. Seaman,
removed the green blanket covering his body, and saw blood on his face and the cell
floor. *Id.* Covey then had Lovelace secure Glanton and called for medical backup.
*Id.* Both Lovelace and Covey asked Glanton about what happened in ISO-2, but
Glanton never responded to either deputy.[5] Dkt. 91-1 at 65:10-20; Dkt. 91-2 at
48:12-17. Nurse Broom entered ISO-2 and, after observing Mr. Seaman, informed
Covey that they needed to call an ambulance. Dkt. 91-2 at 61:23-62:14. Following
the arrival of medical staff, Covey and Lovelace were managing the other inmates
in S-Med and did not accompany Mr. Seaman to the hospital. Dkt. 91-1 at 67:16-22;
Dkt. 91-2 at 62:9-14.

When Nurse Broom went into ISO-2, she recalls Mr. Seaman lying "on his
stomach," and she had to "uncover" him since Mr. Seaman still had the suicide
smock[6] over him. Dkt. 91-4 at 51:1-15. After "log roll[ing]" Mr. Seaman onto his

---

[5] While Glanton's deposition was not taken, he did provide a statement to the State Attorney's Office for the 10th
Judicial Circuit. In that statement, Glanton recalled that after Collins was removed from ISO-2, "Smith approached
[Mr. Seaman], who was asleep in the back corner of the cell and lying face down on the ground and began to repeatedly
stomp on [Mr. Seaman's] head. Smith then put a blanket over [Mr. Seaman's] head and walked away. Approximately
ten minutes later, Smith walked back to [Mr. Seaman] and repeatedly stomped on his head again multiple times." Dkt.
91-10 at 8–9.  Importantly, "Glanton stated at this time, detention staff removed Smith and Collins from the cell, but
he does not believe detention staff saw [that Mr. Seaman] was injured since his head was covered by a blanket placed
by Smith." *Id.* at 9.
[6] Inmates on suicide watch are provided with a suicide-prevention garment—a "suicide smock." Dkt. 91-4 at 80:15-
22.

back, Nurse Broom found him decerebrate,[7] with the snoring respirations and fixed

pupils. *Id.* at 51:1-15, 81:4-14. When medical staff failed to get a pulse oxygen

reading on Mr. Seaman, Nurse Broom immediately told the deputies to call 911. *Id.*

at 48:3-12. While inside ISO-2, Nurse Broom remembers a pool of blood underneath

Mr. Seaman, but did not recall seeing any blood on the walls of the cell. *Id.* at 49:3-

12.[8]

      *f.  Inmate John Smith*

John Smith was classified as a "Maximum" security inmate based on the

severity of the current offense and the seriousness of his offense history. Dkt. 92 ¶

3; Dkt. 91-5 (showing custody assessment of John Smith). Defendant Covey testified

that he knew of John Smith from "word through the jail." Dkt. 92 ¶ 1.  Nurse Broom

was aware of John Smith from multiple past altercations and described him as being

"aggressive." *Id.* ¶ 2. Defendant Hensley personally observed John Smith fighting

another inmate on at least two separate occasions. *Id.* ¶ 5.

---

[7] A medical term used to describe a patient who has their arms and legs outstretched, with muscles held rigidly. Dkt. 91-4 at 50:10-22. Decerebrate posturing is an indicator of severe brain damage.

[8] Additionally, Nurse Broom also opined that "based on the condition of Seaman, he wouldn't have lasted four hours in that cell." Dkt. 91-4 at 57:23-24. Nurse Broom further explained that:

> based on the condition that we found Seaman in at the time, it was my opinion that if he had been in that condition for four hours, there was no way he would have lived for [those] four hours in that condition. I would have assumed that, you know, it had [] happened much later in the shift. But again, that was, at that point, my opinion, and I didn't know, you know, if he had just gotten to that point or if he was, you know, much better and just progressively worsened.

*Id.* at 58:5-14. When asked if she had an opinion on whether Mr. Seaman's condition progressively worsened, Nurse Broom clarified, "No, I couldn't say that. But I knew what I was saying was he would not have lasted four hours without medical attention in the condition that he was in at that time." *Id.* at 58:15-21.

Defendant Fain, however, did not know Smith to have behavioral issues, and never had "an issue" with him. Dkt. 83 ¶ 59. Nor does Fain recall any incident with Smith prior to the altercation between Smith and Collins. *Id.* Defendant Viviano does not recall having any prior contact with Smith before May 13, 2021, and was not aware of his "maximum" classification status. Dkt. 82 at 15:9-21, 27:3-8. Defendant Morales also never had any prior interaction with Smith and did not know of Smith's "maximum" classification when reassigned to S-Med on May 13, 2021. Dkt. 91-3 at 12:1-3, 15:22-16:2, 19:16-22.

## II.    Polk County Sheriff's Office Suicide Watch Policy

"S-Med" houses medically classified inmates whom medical staff have determined cannot be housed in the general population, including inmates on suicide watch or medical observation. Dkt. 83 ¶ 38. ISO cells are used to house inmates on suicide watch, and the policy regarding suicide watch is that inmates are housed without property and given suicide prevention clothing. *Id.* ¶ 39. Direct observation for an inmate on suicide watch is a one-on-one watch when an inmate is actively trying to harm himself. *Id.* ¶ 40; *see* Dkt. 91-13 at 2 ("When the inmate is at the nurse's station and the nurse determines the inmate is suicidal . . . The inmate shall be placed into a holding cell away from the general population. A single inmate on suicide watch constitutes a one (1)-on-one (1) suicide watch.").

13

However, when an inmate only requires "increased observation to ensure the safety of inmates that may be of higher risk of something happening to them" than the general population, 15-minute observation checks are done instead. Dkt. 83 ¶ 41; *see* Dkt. 91-13 at 2 ("The inmate shall be observed every fifteen (15) minutes either continuously or at irregular intervals not to exceed fifteen (15) minutes by the detention staff."). Looking for "signs of life" during the 15-minute checks does not include physically going into the cell and manipulating the inmate. Dkt. 83 ¶ 41. As a precaution, detention deputies assigned to S-Med conduct their rounds every 13 minutes and constantly walk around and monitor the inmates during these rounds. *Id.* ¶ 42.

When an inmate is on suicide watch and is lying down or sleeping, deputies generally look for anything "out of the ordinary" and signs of breathing. Dkt. 82 at 106:17-107:5. Inmates on suicide watch sleep a lot, and it is common for them to be lying under the green blankets. Dkt. 83 ¶ 45. Detention deputies generally do not look up disciplinary reports for inmates on suicide watch, as inmates are held together, regardless of classification. *Id.* ¶ 46. In the ISO cells, maximum and minimum-security inmates may be held together, but they are not held together in general population cells. *Id.*

### III.    The Instant Litigation

On May 12, 2023, Donna Ann Seaman, as the personal representative for Mr. Seaman's estate, filed the instant suit. Dkt. 1. Ms. Seaman brings 42 U.S.C. § 1983 and state law wrongful death claims against Defendants in this case. *Id.* As relevant to the instant motion for summary judgment, Ms. Seaman brings the following claims against the Detention Deputies and Sheriff Grady Judd:[9]

- Marc Fleurjean (Individual Capacity) — **Count I**- 42 U.S.C. § 1983 Deliberate Indifference Claim and **Count XI**- 42 U.S.C. § 1983 Failure to Protect Claim

- Jonathan Morales (Individual Capacity) — **Count II**- 42 U.S.C. § 1983 Deliberate Indifference Claim and **Count XII**- 42 U.S.C. § 1983 Failure to Protect Claim

- Christopher Covey (Individual Capacity) — **Count III**- 42 U.S.C. § 1983 Deliberate Indifference Claim and **Count XIII**- 42 U.S.C. § 1983 Failure to Protect Claim

- Jesse Lovelace (Individual Capacity) — **Count IV**- 42 U.S.C. § 1983 Deliberate Indifference Claim and **Count XIV**- 42 U.S.C. § 1983 Failure to Protect Claim

- Jason Fain (Individual Capacity) — **Count V**- 42 U.S.C. § 1983 Deliberate Indifference Claim and **Count XV**- 42 U.S.C. § 1983 Failure to Protect Claim

- John Viviano (Individual Capacity) — **Count VI**- 42 U.S.C. § 1983 Deliberate Indifference Claim and **Count XVI**- 42 U.S.C. § 1983 Failure to Protect Claim

---

[9] Defendants Lynn Broom and Corizon Health Inc. did not join the instant motion for summary judgment. *See generally* Dkt. 84. Additionally, the proceedings in this case against Defendant Corizon Health have been stayed pursuant to the automatic stay provision of the United States Bankruptcy Code, 11 U.S.C. § 362(a). *See* Dkt. 11.

- Ronald Hensley (Individual Capacity) — **Count VII**- 42 U.S.C. §
  1983 Deliberate Indifference Claim, **Count XVII**- 42 U.S.C. § 1983
  Failure to Protect Claim, and **Count XVIII**- 42 U.S.C. § 1983
  Failure to Train Claim

- Sheriff Grady Judd (Official Capacity) — **Count XIX**- 42 U.S.C. §
  1983 Failure to Train Claim, **Count XX**- 42 U.S.C. § 1983 Policy
  Liability Claim, and **Counts XXI–XXVII**- Wrongful Death Claims
  under Fla. Stat. § 768.28

*Id.* at 1–68.

On March 25, 2025, the Detention Deputies and Sheriff Grady Judd filed the

instant motion for summary judgment, arguing the Detention Deputies are entitled

to qualified immunity, Sheriff Judd is entitled to summary judgment on the official

capacity claims, and Sheriff Judd is not vicariously liable on the state law wrongful

death claim. Dkt. 84 at 4.

## LEGAL STANDARD

Summary judgment is only appropriate when there is "no genuine issue as to

any material fact [such] that the moving party is entitled to a judgment as a matter

of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed R. Civ. P. 56(a).

An issue of fact is "material" if it might affect the outcome of the case under the

governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is

"genuine" if the evidence could lead a reasonable jury to find for the non-moving

party. *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587 (1986).

The moving party has the burden of proving the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party. *See Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001) (noting a court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party"). Once the moving party satisfies its initial burden, it shifts to the non-moving party to come forward with evidence showing a genuine issue of material fact that precludes summary judgment. *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e), (c). Speculation or conjecture cannot create a genuine issue of material fact. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).

The court may not weigh evidence to resolve a factual dispute; if a genuine issue of material fact is present, the court must deny summary judgment. *Hutcherson v. Progressive Corp.,* 984 F.2d 1152, 1155 (11th Cir. 1993). Likewise, the court should deny summary judgment if reasonable minds could differ on the inferences arising from undisputed facts. *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1534 (11th Cir. 1992).

Importantly, a district court is only required to consider "the cited materials" when deciding a summary judgment motion, Fed. R. Civ. P. 56(c)(3), and "[m]aking district courts dig through volumes of documents and transcripts would shift the

burden of sifting from petitioners to the courts . . . [D]istrict court judges are not required to ferret out delectable facts buried in a massive record." *Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011). "[T]here is no burden upon the district court to distill every potential argument that could be made based on the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Solutia, Inc. v. McWane, Inc.*, 672 F.3d 1230, 1239 (11th Cir. 2012) (per curiam) (citing *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (en banc)).

## DISCUSSION

Defendants moves for summary judgment on several grounds, arguing the Detention Deputies are entitled to qualified immunity on the failure to protect and deliberate indifference to a serious medical need claims; Sheriff Judd is entitled to summary judgment on the official capacity claims because there is no official policy behind any purported constitutional violation; and Sheriff Judd is not vicariously liable on the state law wrongful death claims because Mr. Seaman's death was not caused by a negligent or wrongful act or omission by any employee. Dkt. 84 at 4. The Court will address each argument in turn.

## I.    Qualified Immunity Standard

Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012). "[E]ntitlement to qualified immunity is for the court to decide as a matter of law." *Simmons v. Bradshaw*, 879 F.3d 1157, 1163 (11th Cir. 2018). When determining whether government officials are entitled to qualified immunity, "courts are required to view the facts and draw reasonable inferences in the light most favorable to the [non-moving party]." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotations omitted). "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." *Id.* "If, at the summary judgment stage, the evidence construed in the light most favorable to the plaintiff shows that there are facts inconsistent with granting qualified immunity, then the case and the qualified immunity defense proceed to trial." *Stryker v. City of Homewood*, 978 F.3d 769, 773 (11th Cir. 2020).

To receive qualified immunity, an official must first "establish that he or she acted within the scope of discretionary authority when the allegedly wrongful acts occurred." *Robinson v. Sauls*, 46 F.4th 1332, 1340 (11th Cir. 2022) (citation and internal quotations omitted). Once this showing is made, the burden shifts to the

plaintiff to show that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation". *Id.* at 1340–41 (citation and internal quotations omitted).

Here, Plaintiff does not dispute that the Detention Deputies were acting within the scope of their discretionary authority while performing their duties in S-Med during the relevant time period. *See* Dkt. 1 ¶ 21; Dkt. 91 at 4–5. Instead, the heart of this dispute is Plaintiff's contention that the Detention Deputies violated Mr. Seaman's Fourteenth Amendment Right to be protected from a substantial risk of serious harm from another inmate. Therefore, Plaintiff bears the burden of showing that the Detention Deputies are not entitled to qualified immunity. *See Stalley v. Cumbie*, 124 F.4th 1273, 1284 (11th Cir. 2024) (citing *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017)). To prevail, Plaintiff must show (1) that the Detention Deputies' conduct violated Mr. Seaman's constitutional rights, and (2) that the rights were clearly established at the time of the alleged violation. *Id.*

## II.    42 U.S.C. § 1983 Failure to Protect and Deliberate Indifference Claims against the Detention Deputies

Plaintiff brings Fourteenth Amendment failure to protect and deliberate indifference to a serious medical need claims against all seven detention deputies in their individual capacities. *See* Dkt. 1. The Eighth Amendment's[10] proscription

---

[10] Technically, Plaintiff's failure to protect and deliberate indifference claims stem from the Eighth Amendment and only apply to convicted prisoners. *See Purcell ex rel. Est. of Morgan v. Toombs Cnty., Ga.*, 400 F.3d 1313, 1318 n.13 (11th Cir. 2005). Since Mr. Seaman was a pretrial detainee, the Due Process Clause of the Fourteenth Amendment,

against cruel and unusual punishment governs the treatment of inmates while in prison. *Farmer v. Brennan*, 511 U.S. 825, 832–34 (1994). The prohibition requires prison officials to "take reasonable measures to guarantee the safety of the inmates." *Id.* at 832 (internal quotation marks omitted). The duty to protect encompasses "protect[ing] prisoners from violence at the hands of other prisoners." *Id.* at 833 (citation and internal quotation marks omitted). When a plaintiff invokes this principle in a lawsuit against prison officials, courts refer to the plaintiff's claims as a "failure-to-protect" claim. *Cox v. Nobles*, 15 F.4th 1350, 1357 (11th Cir. 2021). Additionally, the "deliberate indifference to [the] serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain'" in violation of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). The Court begins by addressing Plaintiff's failure to protect claims and then considers the deliberate indifference to a serious medical need claims against all the Detention Deputies.

a. *Failure to Protect*

To succeed on a failure to protect claim under Section 1983, a plaintiff must satisfy three elements: (1) the plaintiff must show that she was incarcerated under

---

not the Eighth Amendment's prohibition against cruel and unusual punishment, governs the Court's analysis. *See Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 n.4 (11th Cir. 1995). Nevertheless, the analysis is the same because "the standards under the Fourteenth Amendment are identical to those under the Eighth." *Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007); *see Patel v. Lanier Cnty. Georgia*, 969 F.3d 1173, 1188 (11th Cir. 2020); *Keith v. DeKalb Cnty., Georgia*, 749 F.3d 1034, 1045 n.35 (11th Cir. 2014).

conditions posing a substantial risk of serious harm; (2) the plaintiff must show that the prison official had a sufficiently culpable state of mind, amounting to deliberate indifference; and (3) the plaintiff must demonstrate causation—that the constitutional violation caused her injuries. *Cox*, 15 F.4th at 1357–58 (citation and quotations omitted). Plaintiff must establish all three elements to prevail on her failure-to-protect claims.

Element one, a substantial risk of serious harm, "is assessed under an objective standard." *Lane v. Philbin*, 835 F.3d 1302, 1307 (11th Cir. 2016). To prevail, a plaintiff must allege "conditions that were extreme and posed an unreasonable risk of serious injury to his future health or safety." *Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019) (quoting *Lane*, 835 F.3d at 1307). Plaintiff can either demonstrate a "general threat" to inmates based on dangerous conditions or locations in the prison, or an individualized risk based on a "specific threat" to an inmate. *Id.* at 1233, 1235–36; *see also Purcell ex rel. Est. of Morgan v. Toombs Cnty., Ga.*, 400 F.3d 1313, 1320–21 (11th Cir. 2005).

Under the second element, deliberate indifference, a plaintiff must show that a defendant: (1) "was subjectively aware that the inmate was at risk of serious harm"; (2) "disregarded that risk"; and (3) "acted with 'subjective recklessness as used in the criminal law.'" *Wade v. McDade*, 106 F.4th 1251, 1255 (11th Cir. 2024) (en banc) (quoting *Farmer*, 511 U.S. at 839). To demonstrate "subjective recklessness

as used in the criminal law," a plaintiff "must show that the defendant was actually,
subjectively aware that his own conduct caused a substantial risk of serious harm to
the plaintiff[.]" *Id.* at 1262 (quoting *Farmer*, 511 U.S. at 839). Subjective awareness
requires that a defendant "must both be aware of facts from which the inference
could be drawn that a substantial risk of serious harm exists, and he must also draw
the inference." *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 617 (11th Cir.
2007) (quoting *Farmer*, 511 U.S. at 837). The determination of whether a risk has
been disregarded is objective: "the [defendant] must have responded to the known
risk in an unreasonable manner, in that he or she 'knew of ways to reduce the harm'
but knowingly or recklessly declined to act." *Marbury*, 936 F.3d at 1233 (quoting
*Rodriguez*, 508 F.3d at 620). In other words, "even if the defendant 'actually knew
of a substantial risk to inmate health or safety,' he 'cannot be found liable under the
Cruel and Unusual Punishment Clause' if he 'responded reasonably to the risk.'"
*Wade*, 106 F.4th at 1262 (quoting *Farmer*, 511 U.S. at 844–845). "As applied in the
prison context, the deliberate-indifference standard sets an appropriately high
bar." *Swain v. Junior*, 961 F.3d 1276, 1285 (11th Cir. 2020).

"Finally, the plaintiff must show a 'necessary causal link' between the
defendant's failure to act reasonably and the plaintiff's injury." *Marbury*, 936 F.3d
at 1233 (quoting *Rodriguez*, 508 F.3d at 623). A causal connection requires that the
defendant "(1) had the means substantially to improve the inmate's safety, (2) knew

that the actions he undertook would be insufficient to provide the inmate with reasonable protection from violence, and (3) had other means available to him which he nevertheless disregarded." *Nelson v. Tompkins*, 89 F.4th 1289, 1298 (11th Cir. 2024) (quoting *Rodriguez*, 508 F.3d at 622).

Here, Defendants seem to concede that Smith could be considered a general threat that posed a substantial risk of serious harm to Mr. Seaman based on his violent history. Dkt. 84 at 7. Instead, Defendants focus on Plaintiff's failure to show the second element of deliberate indifference. *Id.* Specifically, Defendants maintain that "even if [the Detention Deputies] knew John Smith was a problem inmate, was 'prone to violence,' or had a history of causing problems in the Jail, this would not be enough to establish that they were subjectively aware of a risk to [Mr. Seaman]." *Id.* at 9. Plaintiff, however, contends Defendants "had subjective knowledge of the risk of serious harm presented by John Smith" and "disregarded the serious risk by allowing John Smith to remain unsupervised in the cell with Mr. Seaman for 10-15 minutes after they observed John Smith with his foot on Collins' neck." Dkt. 91 at 8, 10.

Threats between inmates are commonplace and thus, "[n]ot 'every injury suffered by one prisoner at the hands of another . . . translates into a constitutional liability for prison officials responsible for the victim's safety.'" *Mosley v. Zachery*, 966 F.3d 1265, 1276 (11th Cir. 2020) (omission in original) (quoting *Bowen v.*

24

*Warden, Baldwin State Prison*, 826 F.3d 1312, 1320 (11th Cir. 2016)). Indeed, correction officers "must possess enough details about a threat to enable them to conclude that it presents a 'strong likelihood' of injury, not a 'mere possibility.'" *Marbury*, 936 F.3d at 1236 (citations omitted). As such, Plaintiff must show that Mr. Seaman "suffered a deprivation that was, objectively, sufficiently serious[,]" and that he suffered that deprivation because all the Detention Deputies, some of whom were not even on duty at the time of Mr. Seaman's death, were deliberately indifferent to a risk of serious harm—i.e., the risk of harm of keeping John Smith in the cell with Mr. Seaman after John Smith violently attacked another inmate. *Wade*, 106 F.4th at 1262 (citation and quotations omitted).

Because Defendants seemingly concede element one (and construing the facts in a light most favorable to Plaintiff), the Court finds a reasonable jury could find that keeping Mr. Seaman housed in ISO-2 with a violent inmate who had just brutally attacked another inmate can constitute a substantial risk of serious harm.

Next, the Court considers element two, deliberate indifference, and asks whether (1) the Detention Deputies were "subjectively aware that [Mr. Seaman] was at risk of serious harm[,]" (2) they "disregarded that risk[,]" and (3) they "acted with 'subjective recklessness as used in the criminal law[.]'" *Id.* at 1255. Furthermore, the Detention Deputies "'cannot be found liable under the Cruel and Unusual Punishment Clause' if [they] 'responded reasonably to the risk.'" *Id.* at 1262

(quoting *Farmer*, 511 U.S. at 844–45). Because the seven detention deputies were
on shift at different times, on different days, and had varying levels of involvement
on the day of Smith's fatal attack, the Court analyzes the deputies separately. *See
Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008) ("Each individual
Defendant must be judged separately and on the basis of what that person knows.").

### i.  Defendant Marc Fleurjean

To satisfy the subjective component of deliberate indifference, Plaintiff had
to show that before the assault, Defendant Fleurjean was "aware of facts from which
the inference could be drawn that a substantial risk of serious harm exist[ed]" and
that Fleurjean "dr[ew] the inference." *Farmer*, 511 U.S. at 837. But nothing in the
record indicates that Fleurjean was aware of any danger facing Mr. Seaman before
the fatal attack by John Smith.

Critically, Fleurjean was not even on duty at the South County Jail when
Smith assaulted Mr. Seaman. There is no dispute that he was assigned to S-Med on
May 12-13, 2021, for the overnight shift from 6:00 PM to 6:00 AM. Dkt. 80 at 11:17-
12:3, 17:23-25. As such, Fleurjean's only interaction with Mr. Seaman was when he
was housed in ISO-2 during the deputy's overnight shift *prior* to the fatal attack. *Id.*
at 18:1-24. Again, at the time of Smith's attack on Mr. Seaman on May 13, 2021, at
around 3:25 PM, Fleurjean had already finished his overnight shift and was not on
duty. *Id.* at 11:17-12:3, 36:14-37:2. Put simply, there is no indication that Fleurjean

was subjectively aware of a future attack by Smith nine hours after getting off duty or that he was involved with the decision to keep Smith in ISO-2 with Mr. Seaman following the fight. Thus, the Court finds Defendant Fleurjean is entitled to qualified immunity on Plaintiff's failure to protect claim in Count XI.

    ii.  Defendants John Viviano, Jonathan Morales, and Jason Fain

As to Defendants Viviano, Morales, and Fain, the three deputies in S-Med at the time of Smith's fatal attack on Mr. Seaman, Plaintiff has failed to sufficiently demonstrate the subjective component of the deliberate indifference test.

"[A] general awareness of an inmate's propensity for being violent does not satisfy the subjective awareness requirement." *Oliver v. Harden*, 587 F. App'x 618, 620 (11th Cir. 2014) (citing *Carter v. Galloway*, 352 F.3d 1346, 1350 (11th Cir. 2003)). In *Carter*, the court affirmed summary judgment for the defendants in a Section 1983 action where the plaintiff, a "Level 1" inmate with no history of violence while in prison, was assaulted by a close-security "Level 5" inmate with whom he shared a cell, and who was pending reclassification to maximum-security status. 352 F.3d at 1347–48. Although the defendants "clearly knew that [the Level 5] inmate Barnes was a 'problem inmate' with a well-documented history of prison disobedience and had been prone to violence," and although the correction officers also had "specific notice from Plaintiff that Inmate Barnes acted crazy, roaming his cell like a 'caged animal,'" this knowledge was not enough to show that defendants

were deliberately indifferent to a substantial risk of serious harm. *Id.* at 1349–50. Any "negligent failure" of the defendants to protect the plaintiff from an attack did not create the sufficiently culpable state of mind necessary to satisfy the subjective awareness requirement when none of the statements constituted a threat and no request for protective custody was ever made. *Id.* at 1350.

*Rodriguez v. Secretary for Dept. of Corrections* also offers insight into the subjective component. 508 F.3d 611 (11th Cir. 2007). In *Rodriguez*, the Eleventh Circuit considered whether the prison-official defendants were subjectively aware of a substantial risk of serious harm facing the prisoner-plaintiff ahead of a brutal prison attack. *Id.* at 613. The summary judgment record indicated that Rodriguez "verbally informed [Defendant] Kugler" on "at least two occasions" of threats made against his life. *Id*. at 618. Similarly, Rodriguez "spoke to [Defendant] Johnson on a number of occasions regarding the threats on his life." *Id*. at 614. Rodriguez also filed "an Inmate Request form," in which he communicated that he feared for his safety and requested protection. *Id*. In vacating the grant of summary judgment for the defendants, the circuit court concluded that the plaintiff's communications comprised "enough evidence of subjective knowledge to get [Rodriguez's] claim to a jury." *Id.* at 618.

Here, unlike the plaintiff in *Rodriguez*, the record is devoid of any facts that would demonstrate that Defendants Viviano, Morales, and Fain were subjectively

aware of a substantial risk of harm faced by Mr. Seaman. First, in contrast to the threats on the plaintiff's life that the defendants were made aware of in *Rodriguez*, there is no evidence of any verbal threats made by Smith on Mr. Seaman's life. Nor is there any evidence that Mr. Seaman spoke to the three deputies about fearing for his safety or needing protective custody. Second, while Defendants Viviano and Morales were the first responders to Smith's attack on Collins, there is no indication that Smith was going to subsequently attack Mr. Seaman after the deputies broke up the initial fight. Indeed, Viviano recalls that Smith was not immediately removed from ISO-2 since he was compliant and showed no signs of aggression. Dkt. 82 at 39:19-24; 108:22-109:7. Morales testified Smith was not removed from ISO-2 immediately since he had complied with his verbal commands to get off Collins, and Morales' priority was to get the victim (Collins) away from the aggressor (Smith) by moving Collins to another ISO cell. Dkt. 91-3 at 39:19-40:24, 45:10-16. When Fain arrived at ISO-2 after hearing shouting, he recounted that additional deputies were not called as "the situation was under control." Dkt. 77 at 53:16-54:19. Fain also recalls Smith being compliant and not attacking any other inmates or deputies after breaking up the altercation with Collins. *Id.* at 86:1-87:5.

Third, Viviano, Morales, and Fain's general awareness about Smith's violent history is not enough to satisfy the subjective component. Plaintiff is correct that Smith has a history of fighting other inmates, and these fights are documented in

Incident Reports and Disciplinary Reports, which are available for all detention
deputies to view. Dkt. 91 at 9. Collins also specifically told Fain that another inmate
(allegedly Smith) had punched him during breakfast on May 13. Dkt. 77 at 27:4-12.
However, as shown in *Carter*, housing a low-security inmate (like Mr. Seaman) with
a maximum-security inmate (like Smith) who has a well-documented history of
violence—without more—is not enough to show that the three detention deputies
were deliberately indifferent to a substantial risk of serious harm *posed to Mr.
Seaman*. *See Carter*, 352 F.3d at 1349–50. Instead, the record only shows that
Viviano, Morales, and Fain might have been subjectively aware of a substantial risk
of serious harm *posed to Collins*, and the deputies reasonably acted upon that threat
by immediately entering ISO-2 to remove Smith from Collins' neck, removing
Collins from the cell, and providing him with medical attention. Dkt. 82 at 38:23-
39:14, 40:10-17; Dkt. 91-3 at 42:13-44:4; Dkt. 77 at 51:4-53:12.

Put simply, to find Viviano, Morales, and Fain culpable, based on their
subjective awareness of Smith's "propensity for being a problematic inmate," would
"unduly reduce awareness to a more objective standard, rather than the required
subjective standard set by the Supreme Court." *Carter*, 352 F.3d at 1350; *see
Johnson v. Boyd*, 568 F. App'x 719, 722 (11th Cir. 2014) (finding attacker's
destructive behavior in cell prior to attack did not sufficiently show a "strong
likelihood" of injury to plaintiff); *Chatham v. Adcock*, 334 F. App'x 281, 293 (11th

Cir. 2009) (finding no deliberate indifference shown where plaintiff's fellow inmate was a "problem inmate" with "violent tendencies," and plaintiff asserted that fellow inmate threatened him repeatedly in days before assault, but did not identify any specific serious threat from fellow inmate which he then reported to any other corrections officer before the assault on him); *McBride v. Rivers*, 170 F. App'x 648, 655 (11th Cir. 2006) (finding no subjective knowledge of a risk of serious harm where plaintiff merely advised he "had problems" with fellow inmate and stated he was "in fear for [his] life" if placed in same cell with his eventual assailant, but "did not identify a specific prior incident, from which the defendant could infer that a substantial risk existed"); *Lavender v. Kearney*, 206 F. App'x 860, 863–64 (11th Cir. 2006) ("General knowledge about an inmate's violent tendencies, without more specific information about the risk, does not constitute deliberate indifference"). Because no constitutional violation has been shown, the Court finds that Defendants Morales, Fain, and Viviano are entitled to qualified immunity on Plaintiff's failure to protect claims in Counts XII, XV, and XVI.

### iii.  Defendant Ronald Hensley

Next, nothing in the record indicates that Defendant Hensley was subjectively aware of any danger facing Mr. Seaman before the fatal attack by Smith. Like Defendant Fleurjean, Hensley was not on shift in S-Med at the time of Smith's attack on Collins and Mr. Seaman. Hensley was initially assigned to S-Med on May 13,

31

but was reassigned to "Building 7" at around 12:30 PM. Dkt. 79 at 65:3-21. Hensley only returned to S-Med at around 4:00 PM to relieve Defendant Viviano. *Id.* at 65:22-66:4. Importantly, Hensley was not present during Smith and Collin's physical altercation and only heard about the incident from Defendant Viviano. *Id.* at 68:5-25. When Hensley returned to S-Med in the afternoon, Collins and Smith were already separated and removed from ISO-2. *Id.* at 69:3-24. Because Hensley was in another part of the jail in the hours leading up to Smith's fatal attack on Mr. Seaman, Plaintiff cannot show Hensley was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that Hensley "dr[ew] the inference." *Farmer*, 511 U.S. at 837.

However, Plaintiff points to evidence showing that Hensley had subjective knowledge of "John Smith's propensity for violence" based on prior interactions with Smith. Dkt. 91 at 9. Hensley had previously authored two incident reports involving Smith fighting with other inmates, one dated May 4, 2021, and the other on May 12, 2021. Dkt. 79 at 32:3-34:23; *see* Dkt. 91-8; Dkt. 91-9. Additionally, in the early morning hours of May 13, Collins reported to Hensley that another inmate (allegedly Smith) had punched him while showering. Dkt. 79 at 57:11-23. Nevertheless, as discussed above, such facts might support a finding that Hensley had a subjective awareness of a substantial risk of serious harm posed to Collins, but not nearly enough to show Hensley was deliberately indifferent to a substantial risk

of serious harm to Mr. Seaman. Again, "a general awareness of an inmate's propensity for being violent does not satisfy the subjective awareness requirement." *Oliver*, 587 F. App'x at 620 (citing *Carter*, 352 F.3d at 1350). Plaintiff demonstrates at most that Defendant Hensley "only possessed an awareness of [Smith's] propensity for being a problematic inmate," which alone does not permit the "inferential leap" that Defendant Hensley had the culpable state of mind under the stringent deliberate indifference standard. *See Carter*, 352 F.3d at 1350. The Court finds Defendant Hensley is entitled to qualified immunity on Plaintiff's failure to protect claim in Count XVII.

### iv.  Defendants Christopher Covey and Jesse Lovelace

Finally, the Court also finds Plaintiff has failed to sufficiently demonstrate the subjective component of the deliberate indifference test as to Defendants Covey and Lovelace. Both Lovelace and Covey worked the 6:00 PM to 6:00 AM shift in S-Med on May 13-14, 2021. Dkt. 91-1 at 38:7-23; Dkt. 91-2 at 30:23-31:3. At the beginning of their shift, Lovelace and Covey were briefed about the incident between Smith and Collins, and both inmates had already been separated. Dkt. 91-1 at 29:10-30:2; Dkt. 91-2 at 25:9-22. Lovelace testified that Smith had already been moved from S-Med, away from Mr. Seaman, who was still in ISO-2. Dkt. 91-1 at 43:3-11. In other words, because any substantial threat from Smith had long passed, there is no possibility that Covey and Lovelace were subjectively aware that Mr. Seaman was

at risk of serious harm while he lay in ISO-2. Nor could they have disregarded any possible risk since Smith was not even housed in S-Med at the time Covey and Lovelace went on duty. Thus, there is no genuine dispute that Covey and Lovelace did not have a "sufficiently culpable state of mind" that amounted to "deliberate indifference." *Farmer*, 511 U.S. at 834. The Court finds that Defendants Covey and Lovelace are entitled to qualified immunity on Plaintiff's failure to protect claims in Counts XIII and XIV.

### b. *Deliberate Indifference to a Serious Medical Need*

As discussed above, the "deliberate indifference to [the] serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain'" in violation of the Eighth Amendment. *Estelle*, 429 U.S. at 104 (quoting *Gregg*, 428 U.S. at 173). To prove a claim for deliberate indifference to a serious medical need, a plaintiff "must satisfy both an objective and a subjective inquiry," *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003), and must establish a "necessary causal link" between the challenged conduct and their injuries. *Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019).

The objective inquiry turns on whether the plaintiff experienced an "objectively serious medical need." *Farrow*, 320 F.3d at 1243. On the other hand, the subjective inquiry turns on whether the "prison official acted with an attitude of 'deliberate indifference' to [the] serious medical need." *Id.* A prison official acted

with deliberate indifference if he (1) "was subjectively aware that the inmate was at
risk of serious harm"; (2) "disregarded that risk"; and (3) "acted with 'subjective
recklessness as used in the criminal law.'" *Wade*, 106 F.4th at 1255 (quoting *Farmer*,
511 U.S. at 839). The third prong will be satisfied only if the plaintiff shows "that
the defendant actually knew that his conduct—his own acts or omissions—put the
plaintiff at substantial risk of serious harm." *Id.* at 1253. Even when a defendant has
subjective knowledge of a serious risk, "a defendant who 'responds reasonably' to
[such] a risk . . . 'cannot be found liable' under the Eighth Amendment." *Id.* at 1255
(quoting *Farmer*, 511 U.S. at 845). "As applied in the prison context, the deliberate-
indifference standard sets an appropriately high bar." *Swain*, 961 F.3d at 1285.

Defendants' motion for summary judgment does not distinguish between the
two different deliberate indifference claims. Rather, Defendants lump the failure to
protect and deliberate indifference to serious medical needs claims into a single
analysis, arguing the subjective awareness prong has not been met for either type of
Section 1983 claim. *See* Dkt. 84 at 7–11. Plaintiff, however, properly separates the
two distinct claims and first argues Mr. Seaman had an objectively serious medical
need. The Court agrees.

"A serious medical need is 'one that has been diagnosed by a physician as
mandating treatment or one that is so obvious that even a lay person would easily
recognize the necessity for a doctor's attention.'" *Mann v. Taser, Int'l, Inc.*, 588 F.3d

1291, 1307 (11th Cir. 2009) (citation omitted). "[T]he medical need must be one
that, if left unattended, poses a substantial risk of serious harm." *Farrow*, 320 F.3d
at 1243 (citation and quotations omitted).

Here, a reasonable jury could easily find that Mr. Seaman had an objectively
serious medical need as he lay bleeding on the floor in ISO-2 for hours without
medical attention. *See Hinson v. Bias*, 927 F.3d 1103, 1122 (11th Cir. 2018) (noting
that "severe pain that is not promptly or adequately treated can present a serious
medical need"). The undisputed autopsy report showed Mr. Seaman suffered blunt
force trauma to the head, leading to a skull fracture and multiple contusions to his
brain. Dkt. 91-11 at 1, 5. These are serious medical injuries that ultimately proved
fatal. *Id.* at 1; *see Brown v. Hughes*, 894 F.2d 1533, 1538 n.4 (11th Cir. 1990)
(collecting cases and noting that a "recent traumatic injury," like a beating and sexual
assault, automobile accident, soft-tissue shoulder injury, or one-and-a-half inch
bleeding cut, is generally sufficient to demonstrate a serious medical need). Plaintiff
has sufficiently demonstrated that Mr. Seaman had a serious medical need.

The second element, deliberate indifference to that serious medical need,
requires Plaintiff to prove that each of the seven detention deputies was "actually,
subjectively aware that his own conduct caused a substantial risk of serious harm to
the plaintiff" and that they failed to "'respond[ ] reasonably to the risk.'" *Wade*, 106
F.4th at 1262 (quoting *Farmer*, 511 U.S at 844–45). "Each individual Defendant

36

must be judged separately and on the basis of what that person knows." *Burnette*,

533 F.3d at 1331.

### i. Defendant Marc Fleurjean

Plaintiff once again fails to present any evidence demonstrating Defendant

Fleurjean was deliberately indifferent to Mr. Seaman's medical needs. Nothing in

the record indicates that Fleurjean had subjective knowledge of a "substantial risk

of serious harm" to Mr. Seaman at all, let alone one caused by his own

conduct. *Wade*, 106 F.4th at 1262.

As previously discussed, Fleurjean was not even on duty in the South County

Jail at the time of Smith's attack on Mr. Seaman. Dkt. 80 at 11:17-12:3, 36:14-37:2.

While Fleurjean worked another overnight shift on May 13-14, 2021, from 6:00 PM

to 6:00 AM, he was assigned to another part of the South County Jail. *Id.* at 37:9-21.

Fleurjean never went to S-Med during his May 13-14 shift, did not participate in any

subsequent investigation, and did not write a report about the incident. *Id.* at 39:3-

19. As such, Fleurjean cannot be deliberately indifferent to a medical need he is not

even aware of at the time. The Court finds that Defendant Fleurjean is entitled to

qualified immunity on Plaintiff's deliberate indifference to a serious medical need

in Count I.

ii.  Defendants John Viviano, Jonathan Morales, and Jason Fain

As to Defendants Viviano, Morales, and Fain, the three deputies in S-Med at the time of Smith's attack on Mr. Seaman, the deliberate indifference element is a much closer call.

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . ." *Farmer*, 511 U.S. at 842. However, "[g]eneralized awareness of a serious medical need is insufficient to state a claim of deliberate indifference." *Collins v. Ferrell*, No. 21-14027, 2024 WL 4677418, at *3 (11th Cir. Nov. 5, 2024). As such, a plaintiff must point to evidence showing "the defendant prison official *actually knew* of a substantial risk of serious harm, not just that he *should have known*." *Wade*, 106 F.4th at 1257 (emphasis in original).

Plaintiff argues that circumstantial evidence—which *Farmer* says the Court may consider and from which the Court may draw reasonable inferences—indicates that all three deputies knew Smith had attacked Mr. Seaman, and the Court may further assume that all three knew that he faced a risk of serious harm without medical attention. Dkt. 91 at 15–17. First, Plaintiff points to the investigative photographs which show "blood on the walls as follows, west wall blood was present upwards of 5 feet and 11 inches, north wall blood was present upwards [of] 6 feet and 11 inches[,] and on the east wall blood upwards of 6 feet and 9 inches." *Id.* at 15

38

(citing Dkt. 91-12). Blood was also found on the green blankets covering Mr. Seaman and on the floor of ISO-2. *See* Dkt. 91-12 at 48–52. Based on this "overwhelming physical evidence," Plaintiff contends "a strong and reasonable inference arises that the Detention Deputies must have seen the blood" because "[t]he conditions of the cell were such that a visual inspection, even from outside the door or during routine monitoring, would have revealed visible signs of injury and violence." Dkt. 91 at 16. Second, Plaintiff asserts that Viviano, Morales, and Fain were all present or close by when Smith attacked Collins and put a foot on his neck. *Id.* As such, Plaintiff argues that it is "unfathomable to believe that having observed John Smith's foot on Collins' neck, the detention deputies would not perform a safety/welfare check on an inmate in the same cell, regardless of whether there was blood strewn about the cell." *Id.* at 17. Once the three deputies went back to ISO-2 to remove Smith from the cell, "a reasonable inference arises that the deputies did, in fact, observe Mr. Seaman in an injured state and deliberately disregarded what they saw." *Id.*

Defendant, on the other hand, argues there is no deliberate indifference because Glanton, the fourth inmate in the cell, "gave no signal or indication whatsoever that anything was wrong with [Mr. Seaman]. The Detention Deputies were not constitutionally required to assume the worst when there was no subjective knowledge of harm to [Mr. Seaman]. Nor does the lack of entering the ISO-2 cell to

physically shake or manipulate Plaintiff when he appeared to be sleeping show a subjective knowledge of a substantial risk of serious harm." Dkt. 84 at 11.

Here, even when construing the facts in Plaintiff's favor, the Court cannot reasonably infer that once Viviano, Morales, and Fain returned to ISO-2 to remove Smith from the cell, they must have known about Mr. Seaman's serious medical need based on physically entering ISO-2, the speckles of blood on the walls, and Mr. Seaman lying under a blanket that covered his injuries. While none of the three deputies decided to check on Mr. Seaman's welfare, despite having the ability to do so after removing Smith and Collins from ISO-2, *see* Dkt. 82 at 48:16-19; Dkt. 77 at 63:19-64:6, the decision not to do so in hindsight does not mean it was unreasonable. *See Stalley*, 124 F.4th at 1287 ("We know with the benefit of hindsight that the decision did not succeed in saving Villegas's life. But that does not mean it was an unreasonable decision, much less a deliberately indifferent one."); *Powell v. Snook*, 25 F.4th 912, 924 (11th Cir. 2022) ("Qualified immunity leaves room for mistaken judgments.").

Plaintiff must point to evidence showing the three deputies "*actually knew* of a substantial risk of serious harm, not just that he *should have known*." *Wade*, 106 F.4th at 1257 (emphasis in original). First, Morales did not notice any blood on the floor of ISO-2, and neither Nurse Broom nor Glanton informed Morales that Mr. Seaman was hurt. Dkt. 91-3 at 72:10-73:9. Nor did Morales recall anyone in ISO-2

crying out in pain. *Id.* Second, Viviano also does not remember Mr. Seaman or anyone else calling for help, nor does he remember seeing any blood on the floor when he entered the cell to remove Smith. Dkt. 82 at 109:8-110:22. Finally, Fain testified that it is not abnormal to see inmates constantly lying around, nor is it common practice to physically wake up inmates during the 15-minute observations.[11] Dkt. 77 at 91:1-18. When Fain delivered Mr. Seaman's food tray to ISO-2 (following Smith's removal), he did not recall seeing any blood or anything abnormal about Mr. Seaman lying down. *Id.* at 92:9-15. Even though Mr. Seaman failed to acknowledge his food tray, Fain testified that it is not "odd" for an inmate to ignore the deputies when passing out food trays. *Id.* at 61:6-13.

At bottom, the three deputies were only actually aware of a situation between Collins and Smith, and the deputies reasonably acted upon that threat by immediately entering ISO-2 to remove Smith from Collins' neck, moving Collins from the cell to receive medical attention, and then separating Smith by placing him in ISO-4 alone. Dkt. 82 at 38:23-39:14, 40:10-17, 44:18-45:4; Dkt. 91-3 at 42:13-44:4; Dkt. 77 at 51:4-53:12. While Viviano, Morales, and Fain should have known

---

[11] To the extent Plaintiff argues that the deputies should have been physically interacting with Mr. Seaman during each 15-minute observation based on the Suicide Watch Policy, the Eleventh Circuit has previously found that failing to follow jail policy does not constitute deliberate indifference, absent some evidence of subjective awareness of a risk of harm to Mr. Seaman. *See Stone v. Hendry*, 785 F. App'x 763, 768 (11th Cir. 2019) (concluding that the improper 90-minute gap between cell checks, without evidence of subjective awareness of a risk of harm, cannot give rise to establish a constitutional violation); *Cagle v. Sutherland*, 334 F.3d 980, 989 (11th Cir. 2003) (finding a 100-minute gap between checks, which violated jail policy, did not constitute deliberate indifference); *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1582 (11th Cir. 1995) (finding a 150-minute gap between checks did not constitute deliberate indifference).

41

that Mr. Seaman could have been attacked and severely injured during the ten to fifteen minutes he was left alone with Smith, they cannot be held liable under the Eighth Amendment for not appreciating that Mr. Seaman faced a serious medical need, even if "the risk was obvious and a reasonable prison official would have noticed it." *Farmer*, 511 U.S. at 842 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment."). Because no constitutional violation has been shown, the Court finds that Defendants Morales, Fain, and Viviano are entitled to qualified immunity on Plaintiff's deliberate indifference to a serious medical need claims in Counts II, V, and VI.

### iii.  Defendant Ronald Hensley

With regards to Defendant Hensley, nothing in the record indicates that Defendant Hensley was subjectively aware of Mr. Seaman facing a serious medical need after being attacked by Smith. Again, Hensley was not in S-Med at the time of Smith's attack on Collins and Mr. Seaman. He was reassigned to "Building 7" at around 12:30 PM and only returned to S-Med at around 4:00 PM. Dkt. 79 at 65:3-66:4. Hensley only heard about the incident between Smith and Collins from Defendant Viviano after returning to S-Med. *Id.* at 68:5-25. Moreover, by the time Hensley returned to S-Med in the afternoon, Smith had already been removed from ISO-2 and separated from Mr. Seaman. *Id.* at 69:3-24. Conversely, Plaintiff has

presented no evidence that Hensley, once returning to S-Med in the afternoon, was subjectively aware of Mr. Seaman's injuries.

Because Hensley was in another part of the jail during Smith's fatal attack on Mr. Seaman and only subjectively knew about an (already resolved) altercation between Smith and Collins after returning to S-Med, Plaintiff has failed to demonstrate Hensley was "actually, subjectively aware that his own conduct caused a substantial risk of serious harm to [Mr. Seaman]." *Wade*, 106 F.4th at 1262 (quoting *Farmer*, 511 U.S. at 839). The Court finds Defendant Hensley is entitled to qualified immunity on Plaintiff's deliberate indifference to serious medical need claim in Count VII.

iv.  <u>Defendants Christopher Covey and Jesse Lovelace</u>

Finally, the Court finds Plaintiff has failed to sufficiently demonstrate the subjective component of the deliberate indifference test as to Defendants Covey and Lovelace. As discussed previously, Lovelace and Covey worked the overnight shift in S-Med on May 13-14, hours after Smith's attack on Mr. Seaman. *See* Dkt. 83 ¶ 25. At the beginning of their shift, Lovelace and Covey were briefed about the incident between Smith and Collins, *see* Dkt. 91-1 at 29:10-30:2; Dkt. 91-2 at 25:9-22, but Lovelace recalls that Smith had already been removed from S-Med entirely. Dkt. 91-1 at 43:3-11. During the continuous 15-minute observation checks of the "front cells" in S-Med, Lovelace only remembers that Mr. Seaman was lying down

under the green blanket. Dkt. 91-1 at 47:6-50:15. On the other hand, Covey did not

even observe Mr. Seaman as his 15-minute checks were on the "back cells" (not

ISO-2 where Mr. Seaman was being held). Dkt. 91-2 at 41:3-21.

Even after accepting the facts in the light most favorable to Plaintiff, Covey

and Lovelace's conduct did not rise to the level of "subjective recklessness as used

in criminal law" because neither deputy disregarded Mr. Seaman's serious medical

need. *See Wade*, 106 F.4th at 1255. Indeed, the criminal law standard finds

recklessness "only when a person disregards a risk of harm of which he is

aware[,]" *id.* at 1256, and neither Covey nor Lovelace was aware that Mr. Seaman

had a serious medical need until they began transferring S-Med inmates back to the

general population.  In other words, Covey and Lovelace did not have any subjective

knowledge of a "substantial risk of serious harm" to Mr. Seaman once on shift, let

alone a risk caused by their own conduct. *Id.* at 1262.

Even if Covey and Lovelace had the requisite culpable mental state, a

defendant "'cannot be found liable under the Cruel and Unusual Punishments

Clause' if he 'responded reasonably to the risk.'" *Id.* at 1262 (quoting *Farmer*, 511

U.S. at 844–45). Here, the record shows that Covey and Lovelace reasonably

responded to Mr. Seaman's medical needs by immediately calling for medical staff

once they became aware of a medical emergency. The facts show that at

approximately 7:30 PM, Lovelace and Covey were "clear[ing] off" S-Med by

transferring the inmates back to the general population buildings. Dkt. 91-1 at 62:9-66:20. When Mr. Seaman failed to respond to Covey's command to wake up, he asked Glanton to check up on Mr. Seaman. *Id.* at 62:22-63:4; Dkt. 91-2 at 45:17-47:7. When Covey noticed blood in the cell after Glanton moved Mr. Seaman, he had Lovelace secure Glanton and immediately called for medical backup. Dkt. 91-2 at 45:17-47:7. Put simply, Covey and Lovelace took reasonable steps to reduce the harm once they became aware of Mr. Seaman's injuries. *See Rodriguez*, 508 F.3d at 620 ("An official responds to a known risk in an objectively unreasonable manner if he knew of ways to reduce the harm but knowingly declined to act or if he knew of ways to reduce the harm but recklessly declined to act." (internal quotation marks omitted)).

While Mr. Seaman ultimately passed away from his injuries, Covey and Lovelace were not deliberately indifferent to Mr. Seaman's medical needs. *See Farmer*, 511 U.S. at 844 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."). The Court finds that Defendants Covey and Lovelace are entitled to qualified immunity on

Plaintiff's deliberate indifference to a serious medical need claims in Counts III and
IV.[12]

### III.    42 U.S.C. § 1983 Policy Liability Claim

Plaintiff brings a claim under 42 U.S.C. § 1983 against Sheriff Judd in his
official capacity under *Monell*.[13] The Supreme Court severely restricts municipality
liability under Section 1983. *See Monell v. Dep't. of Social Services*, 436 U.S. 658,
694 (1978). For a municipality to be held liable, it must be directly responsible for
the unconstitutional acts, not simply under a theory of *respondeat superior*. *See
Marsh v. Butler Cty.*, 268 F. 3d 1014, 1027 (11th Cir. 2001).

"A county is liable under [section] 1983 if one of its customs, practices, or
policies was the moving force behind a constitutional injury." *Grochowski v.
Clayton Cnty.*, 961 F.3d 1311, 1321 (11th Cir. 2020) (internal quotation marks
omitted). "[A] plaintiff must show: (1) that his constitutional rights were violated;
(2) that the municipality had a custom or policy that constituted deliberate

---

[12] Even if a reasonable jury could find that Viviano, Morales, Fain, Hensley, Covey, and Lovelace were deliberately indifferent to a serious medical need, the Court is doubtful that there is a genuine dispute as to the causation element. Plaintiff summarily asserts, without any expert medical witness testimony, that a "reasonable jury could conclude the failure to provide timely medical treatment to a known serious injury resulted in Mr. Seaman's untimely death." Dkt. 91 at 18. This unsupported, conclusory statement that Mr. Seaman would have survived if he had gotten medical attention sooner is insufficient to survive summary judgment. Based on the Court's review of the record, the only possible causal link between the Detention Deputies' deliberate indifference in failing to provide timely medical treatment for four hours and Mr. Seaman's death eight days later is Nurse Broom's testimony that Mr. Seaman could not have survived for four hours in the condition he was found in. Dkt. 91-4 at 58:5-14. However, Nurse Broom also testified she could not provide an opinion on whether Mr. Seaman had progressively worsened over time, only that Mr. Seaman "would not have lasted four hours without medical attention in the condition that he was in at that time." *Id.* at 58:15-21.

[13] The Eleventh Circuit has found that "[w]hen, as here, the defendant is the county sheriff, the suit is effectively an action against the governmental entity he represents." *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1115 (11th Cir. 2005).

indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). Under element two, "[a] plaintiff has two methods by which to establish a municipality's policy: identify either (1) an officially promulgated policy or (2) an unofficial custom or practice shown through the repeated acts of a final policymaker for the municipality." *Walker v. City of Calhoun*, 901 F.3d 1245, 1255 (11th Cir. 2018) (alterations adopted). A single incident of unconstitutional activity is not sufficient to demonstrate a policy or custom for purposes of Section 1983 liability. *Craig v. Floyd Cnty., Ga.*, 643 F.3d 1306, 1310 (11th Cir. 2011). Instead, a plaintiff must establish the existence of a pattern of similar violations. *Id.* Alternatively, "[i]n the absence of a series of constitutional violations from which deliberate indifference can be inferred, the plaintiff must show that the policy itself is unconstitutional." *Id.* at 1311 (alteration adopted).

Here, Plaintiff does not identify any official policy or custom to which an inmate's serious medical need is ignored, nor does Plaintiff argue that the Suicide Watch Policy is unconstitutional. Rather, Plaintiff contends that Sheriff Judd failed to train his staff on the Suicide Watch Policy properly, and his deputies' actions in disregarding the policy mean that the Polk County Jail permitted a practice that allowed "15-minute checks without verifying that the inmate was conscious, responsive, or even alive." Dkt. 91 at 24–25. The Court finds no merit in these

arguments. Again, as discussed above, Plaintiff has not shown any underlying violation of Mr. Seaman's constitutional rights. The lack of a constitutional violation is dispositive of his claim for municipal liability. *See Knight ex rel. Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 821 (11th Cir. 2017) (affirming grant of summary judgment for a county and supervising officers because "[t]here can be no policy-based liability . . . when there is no underlying constitutional violation").

Even if Plaintiff had shown an underlying violation, Plaintiff has not pointed to any specific custom or policy that caused Mr. Seaman's death. To the contrary, Plaintiff's expert witness agrees that there were adequate policies in place at the Polk County Jail, *see* Dkt 91-10 at 19–20 (expert report of Aubrey Land), but instead argues that the depositions of the Detention Deputies demonstrate their failure to follow those policies, based on blatant inaccuracies in the observation logs. Dkt. 91 at 27–29. Such evidence forecloses any argument that Sheriff Judd had a policy that caused Mr. Seaman's death. No causation exists when employees do not follow official policies. *See Tittle v. Jefferson Cnty. Comm'n*, 10 F.3d 1535, 1540 (11th Cir. 1994) (explaining that the county cannot be held liable "for the acts and omissions of jail personnel that were contrary to [c]ounty policy"); *Greenway v. S. Health Partners, Inc.*, 827 F. App'x 952, 962 (11th Cir. 2020) ("No causation exists when the policies were not followed."); *Snow ex rel. Snow v. City of Citronelle, Ala.*, 420 F.3d 1262, 1271 (11th Cir. 2005) ("It is only when the execution of the government's

policy or custom inflicts the injury that the municipality may be held liable under

section 1983." (internal quotation marks omitted and alterations adopted)).

However, Plaintiff points to *Rogers v. Sheriff of Santa Rosa Cnty., Fla.*, No.

21-13994, 2023 WL 2566087, at *1 (11th Cir. Mar. 20, 2023), arguing that "customs

and practices for monitoring suicidal inmates that differed from the Polk County

Sheriff's Office written policies" allow for a finding of liability against Sheriff Judd.

The Court disagrees and finds *Rogers* inapposite. In *Rogers*, the defendant sheriff

appealed a district court's denial of its renewed motion for judgment as a matter of

law ("JMOL") *after* a jury returned a verdict in favor of the plaintiff on the *Monell*

claim. *Rogers*, 2023 WL 2566087, at *4. Despite written policies to the contrary,

testimony at trial showed the Santa Rosa County Jail had a practice or custom of (1)

permitting two of the three windows of a suicide watch cell to be covered, (2)

housing suicidal inmates in a cell with a metal partition that blocked a deputy's view

from the booking desk, and (3) "allowing deputies to perform visual checks on

suicidal inmates by glimpsing the inmate through a cell window while the deputy

remained seated at the booking desk." *Id.* at *3. The Eleventh Circuit affirmed the

district court's denial of the renewed JMOL since the jail's deliberately indifferent

policies allowed "Escano-Reyes to be placed in a cell with a metal partition on which

a ligature could be tied and with the majority of its windows concealed by curtains

or other coverings. And contrary to the Jail's written procedures, its custom allowed

49

deputies to monitor Escano-Reyes by performing a solely visual check—in this case, merely seeing flashes of movement—from the booking desk rather than confirming that he was safe." *Id.* at *5.

Here, even construing the record in the light most favorable to Plaintiff, there is no indication that, within the Polk County Jail,[14] there was any policy or custom that reached the level of deliberate indifference shown in *Rogers*. Setting aside the fact that *Rogers* was a suicide case that had already gone to trial, the three policies and customs identified by the Eleventh Circuit have no resemblance to the policies at issue in this case. There are no allegations that, contrary to written policy, the Polk County Jail has permitted the windows in ISO cells to be partially covered or that Polk County correction deputies can conduct 15-minute checks of S-Med from the booking desk. Rather, Plaintiff seems to assume that since the Detention Deputies failed to follow Polk County's written Suicide Watch Policy adequately, *see* Dkt. 91-13 at 2, there must have been a (deliberately indifferent) custom or practice within the Polk County Jail that differed from the written policies. Dkt. 91 at 26–27.

The Court disagrees. When construing the facts in Plaintiff's favor, the depositions of the Detention Deputies demonstrate that they clearly failed to follow Polk County's Suicide Watch Policy, *see id.* at 27–28 (collecting depositions of

---

[14] Because "a suit against a public official in his official capacity is considered a suit against the local government entity he represents," *Owens v. Fulton County*, 877 F.2d 947, 951 n.5 (11th Cir. 1989), the Court refers to "Sheriff Judd" and "the Polk County Jail" interchangeably in this section.

discrepancies in the observation log), but their failure to follow the written policy does not automatically suggest that *another* custom or practice exists within the Polk County Jail. Unlike in *Rogers,* where witnesses testified at trial about internal customs within the jail that were contrary to written policy, *Rogers*, 2023 WL 2566087, at *3–4, the record here simply shows the Detention Deputies failed to follow the written Suicide Watch Policy, not that the Detention Deputies were following some *alternative* internal custom or practice within the Polk County Jail.

Plaintiff also argues that there is an unofficial custom or practice where maximum-security inmates are allowed to be housed with minimum-security inmates in S-Med. Dkt. 91 at 30–31. Plaintiff must show that Sheriff Judd had a custom of permitting a constitutional violation and that this custom was the "moving force" behind that violation. *Craig*, 643 F.3d at 1310 (citing *Grech v. Clayton Cnty.*, 335 F.3d 1326, 1330 (11th Cir. 2003)). A custom is "a practice that is so settled and permanent that it takes on the force of the law." *McDowell*, 392 F.3d at 1290 (quotation omitted). A single incident cannot establish custom; instead, courts look to a practice that is "longstanding and widespread." *Id.* (citing *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991)). "A single incident of a constitutional violation is insufficient to prove a policy or custom even when the incident involves several subordinates." *Myrick v. Fulton Cnty., Ga.*, 69 F.4th 1277, 1299 (11th Cir. 2023).

Here, setting aside that the Court already determined there has been no underlying constitutional violation, Plaintiff has not submitted any evidence of a longstanding and widespread history of constitutional violations in S-Med based on the practice of allowing maximum-security inmates to be housed with minimum-security inmates. The single incident involving Mr. Seaman is insufficient to impose liability on Sheriff Judd. *See Craig*, 643 F.3d at 1310 ("This requirement of proof prevents the imposition of liability based upon an isolated incident ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." (citation and quotations omitted)). Again, there is no evidence from which a reasonable jury could find that Mr. Seaman's death was caused by inadequate policies rather than the failure (of the Detention Deputies) to follow the constitutionally sound policies that were in place at the South County Jail. Sheriff Judd is entitled to summary judgment on the *Monell* claim in Count XX.

## IV.    42 U.S.C. § 1983 Failure to Train

Next, Plaintiff brings failure to train claims against Defendants Hensley[15] and Sheriff Judd in Counts XVIII and XIX. *See* Dkt. 1 ¶¶ 178-193; Dkt. 91 at 19. A plaintiff can also demonstrate official policy by showing there is a policy of

---

[15] Interestingly, Plaintiff brings a failure to train claim against Defendant Hensley, not Defendant Viviano. *See* Dkt. 1 ¶ 179. Defendant Viviano was the deputy who oversaw Defendant Morales' training on May 13, 2021. Dkt. 82 at 28:20-25; Dkt. 91-3 at 29:3-21, 31:3-24.

inadequate training or supervision. *Am. Fed'n of Lab. and Cong. of Indus. Orgs. v. City of Miami,* 637 F.3d 1178 (11th Cir. 2011). "A plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Bd. of County Comm'rs of Bryan County, Okla. v. Brown,* 520 U.S. 397, 407 (1997) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

To establish that a city was "deliberately indifferent," a plaintiff must demonstrate that the municipality knew of the need to train in a particular area and that it made a deliberate choice not to take any action. *Gold v. City of Miami,* 151 F.3d 1346, 1350 (11th Cir. 1998). Deliberate indifference can be established in two ways: (1) by demonstrating a widespread pattern of similar constitutional violations by untrained employees, or (2) by showing that the need for training was so obvious that a municipality's failure to train its employees would result in a constitutional violation. *Connick v. Thompson*, 563 U.S. 51, 61–62 (2011); *Gold,* 151 F.3d at 1350–52. However, without actual or constructive notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise. *Gold*, 151 F.3d at 1351. A municipality may be put on notice of a need to train if it "is aware that a pattern of constitutional violations exists[.]" *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1293 (11th Cir. 2009); *see*

*also Connick*, 563 U.S. at 62 ("A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." (internal citations omitted)).

As an initial matter, there is no evidence that Sheriff Judd had actual or constructive notice that a particular inadequacy in the Suicide Watch Policy was causing jail employees to violate the constitutional rights of inmates. Plaintiff has presented no evidence of a pattern of similar prior constitutional violations by untrained correction deputies in the South County Jail, which would establish actual or constructive notice of a training deficiency. *See Denham v. Corizon Health, Inc.*, 675 F. App'x 935, 942–43 (11th Cir. 2017) (per curiam) (finding that two prior incidents are not enough to support a failure to train theory against a county).

Plaintiff, however, relies on the "obvious" exception, arguing "the need for regular, substantive training on suicide prevention protocols and 15-minute checks is undeniably obvious." Dkt. 91 at 22. "In some cases, the need for training is so obvious that deliberate indifference can be established even without an earlier violation of pattern of abuse[,]" as long as it was "obvious that the municipality's failure to train or supervise its employees would result in a constitutional violation." *Am. Fed'n of Labor*, 637 F.3d at 1189. However, the Eleventh Circuit has cautioned that "the [obvious] exception creating municipal liability under § 1983 for failure to train applies in only a very narrow range of

circumstances and a municipality's culpability 'is at its most tenuous where a claim turns on failure to train.'" *Mingo v. City of Mobile, Ala.*, 592 F. App'x 793, 800 (11th Cir. 2014) (first citing *Brown*, 520 U.S. at 398 and then quoting *Connick*, 563 U.S. at 61). Indeed, "this [obvious] standard is difficult to meet," *Denham*, 675 F. App'x at 942, and a "single instance of unconstitutional conduct can create *Monell* liability only when 'proof of the incident includes proof that it was caused by an existing unconstitutional municipal policy, which policy can be attributed to a municipal policymaker.'" *Martin v. City of Macon Ga.*, 702 F. App'x 941, 944 (11th Cir. 2017) (quoting *Schmelz v. Monroe Cty.*, 954 F.2d 1540, 1544 (11th Cir. 1992)).

Here, Plaintiff does not argue that the Suicide Watch Policy (or any other Polk County Jail policy) is unconstitutional. Instead, Plaintiff contends the depositions from Viviano, Morales, Covey, Lovelace, and Fain—in which all the deputies admit they were "probably" trained on the Suicide Watch Policy at some point at the beginning of their employment but never received continuing training— demonstrates "a systemic failure to adequately train detention deputies on suicide watch procedures, a failure so widespread and fundamental that it rises to the level of deliberate indifference." Dkt. 91 at 20–22 (collecting depositions). The Court disagrees.

Plaintiff concedes that the Detention Deputies received training at some point on the Suicide Watch Policies, but that the failure to "provide ongoing instruction,

reinforcement, or oversight" shows deliberate indifference. Dkt. 91 at 23. However, the Eleventh Circuit has ruled that when a government official receives some training pursuant to constitutional policies, the "obvious" exception does not apply. *See Mingo*, 592 F. App'x at 802 (finding the defendant officers received training at the beginning of their employment at the police academy, and "because the City provides training on the use of a four-point restraint and the identification of the mentally ill—training pursuant to policies that Ms. Mingo concedes are constitutional—the City cannot be held liable under § 1983"); *Lewis*, 561 F.3d at 1293–94 (finding no § 1983 liability where the record contained evidence showing that the city did provided "some training on the use of the hobbles[,]" and concluding that the use of the hobble restraint "does not rise to the level of obviousness reserved for a narrow range of circumstances where a violation of federal rights may be a highly predictable consequence of a failure to provide adequate training." (citation omitted and alteration accepted)).

Additionally, on the issue of whether it was deliberately indifferent to not have the Detention Deputies received continuing training on S-Med policies, the Eleventh Circuit has found "[i]t will not 'suffice to prove that an injury or accident could have been avoided if an officer had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.'" *Mingo*, 592 F. App'x at 801–02 (quoting *City of Canton*, 489 U.S. at 390). "This is so because even adequately

trained officers will sometimes make mistakes, and the fact that they do so does not

necessarily indicate that the training program is inadequate." *Id.* at 802. As such,

because Sheriff Judd provided some training on the Suicide Watch Policy (and that

the training was pursuant to policies that Plaintiff never argues are unconstitutional),

Sheriff Judd cannot be held liable under Section 1983.

Accordingly, Defendant Hensley[16] is entitled to summary judgment on

the individual capacity failure to train claim against him in Count XVIII, and Sheriff

Judd is entitled to summary judgment on the official capacity failure to train

claim against him in Count XIX.

## V.    Wrongful Death Claims under Fla. Stat. § 768.28

Finally, Plaintiff brings state law wrongful death claims in Counts XXI–

XXVII. *See* Dkt. 1 at 53–68. Florida has waived sovereign immunity for torts

committed by government employees, including ordinary negligence claims against

jail officials. Fla. Stat. § 768.28(1); *see also Cook ex rel. Est. of Tessier v. Sheriff of

Monroe Cnty., Fla.*, 402 F.3d 1092, 1119 n.13 (11th Cir. 2005) ("[U]nder Florida

law, a county's treatment of an individual inmate in its custody is an operational

function, for which the State of Florida has waived governmental immunity."").

Indeed, Florida agencies or subdivisions—here, Sheriff Judd in his official

---

[16] Defendant Hensley was not in a supervisory role and was not responsible for training anyone on May 13, 2021. The record undisputedly shows that it was Defendant Viviano who was in charge of training Defendant Morales on the day in question, not Hensley. See Dkt. 82 at 28:20-25; Dkt. 91-3 at 29:3-21, 31:3-24.

capacity—may be sued and "held liable for an employee's intentional act(s) as long as the employee is acting within the course and scope of his employment and the act or omission is not committed in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of the plaintiff's rights." *City of Boynton Beach v. Weiss*, 120 So. 3d 606, 611 (Fla. 4th DCA 2013) (first citing *City of Miami v. Simpson*, 172 So.2d 435, 437 (Fla. 1965); and then citing Fla. Stat. § 768.28). It is uncontested that the Detention Deputies' actions were within the scope of their employment.

The Wrongful Death Act, Fla. Stat. § 768.16, is a tort under Florida law. To establish a negligence-based wrongful death action, a plaintiff must prove "(1) the existence of a legal duty owed to the decedent, (2) breach of that duty, (3) legal or proximate cause of death was that breach, and (4) consequential damages." *Acosta v. Miami-Dade Cnty.*, 97 F.4th 1233, 1242 (11th Cir. 2024) (citing *Jenkins v. W.L. Roberts, Inc.*, 851 So. 2d 781, 783 (Fla. 1st DCA 2003)). "It is long established that, under Florida law, corrections officers owe individuals within their custody a duty to use reasonable care for their safety." *Cook*, 402 F.3d at 1119. The plaintiff bears the burden of proving causation, *see Aycock v. R.J. Reynolds Tobacco Co.*, 769 F.3d 1063, 1069 (11th Cir. 2004), but she needn't necessarily submit expert testimony to do so. *See Claire's Boutiques v. Locastro*, 85 So. 3d 1192, 1195 (Fla. 4th DCA 2012). Florida law follows the "more likely than not" standard of causation and requires

proof that the defendant's conduct probably caused the plaintiff's injury. *Gooding v.*
*University Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984).

As an initial matter, the Court grants summary judgment on the wrongful
death claim in Count XXI that relates to Defendant Fleurjean. As previously
discussed, Fleurjean was not on duty at the South County Jail when Smith attacked
Mr. Seaman, nor was he assigned to S-Med upon his return to duty in the afternoon
of May 13, 2021. Dkt. 80 at 11:17-12:3, 17:23-25, 37:9-21. Plaintiff has cited no
evidence that Fleurjean breached his duty to Mr. Seaman when the deputy was not
physically present in the South County Jail during the entire incident. Thus, Sheriff
Judd is entitled to summary judgment on the wrongful death claim arising from any
of Fleurjean's acts or omissions.

However, there is evidence from which a reasonable jury could find that the
other six detention deputies—Viviano, Morales, Fain, Hensley, Covey, and
Lovelace—were negligent in failing to take steps to protect Mr. Seaman and provide
medical care following Smith's attack and that their acts and omissions caused his
death. Indeed, while the Court found that the six deputies did not have subjective
knowledge that rose to "subjective recklessness as used in the criminal law," a
reasonable jury could still find that (1) the decision to keep Smith in ISO-2 after he
attacked another inmate, (2) being physically present inside ISO-2 without seeing
the any blood, (3) seeing Mr. Seaman lying motionless on the floor (supposedly

59

asleep) after a violent flight in his cell, (4) failing to check on Mr. Seaman's welfare for four hours despite conducting 15-minute checks, and (5) numerous discrepancies in the S-Med observation logs could—when considered together—constitute a breach of duty that more likely than not caused Mr. Seaman's death.

Accordingly, at the summary-judgment stage, where the Court must construe the facts in the light most favorable to Plaintiff, Ms. Seaman has done enough to go to trial on her wrongful death claims. The Court denies Defendants' motion for summary judgment on the wrongful death claim in Counts XXII–XXVII.

## CONCLUSION

Accordingly, it is hereby **ORDERED** and **ADJUDGED** that Defendants' Motion for Summary Judgment, Dkt. 84, is **GRANTED in part and DENIED in part**.

1. Summary judgment is **GRANTED** on the following Counts:
   a. Marc Fleurjean (Individual Capacity) — **Count I**- 42 U.S.C. § 1983 Deliberate Indifference Claim and **Count XI**- 42 U.S.C. § 1983 Failure to Protect Claim
   b. Jonathan Morales (Individual Capacity) — **Count II**- 42 U.S.C. § 1983 Deliberate Indifference Claim and **Count XII**- 42 U.S.C. § 1983 Failure to Protect Claim
   c. Christopher Covey (Individual Capacity) — **Count III**- 42 U.S.C. § 1983 Deliberate Indifference Claim and **Count XIII**- 42 U.S.C. § 1983 Failure to Protect Claim

d. Jesse Lovelace (Individual Capacity) — **Count IV**- 42 U.S.C. § 1983 Deliberate Indifference Claim and **Count XIV-** 42 U.S.C. § 1983 Failure to Protect Claim

e. Jason Fain (Individual Capacity) — **Count V**- 42 U.S.C. § 1983 Deliberate Indifference Claim and **Count XV-** 42 U.S.C. § 1983 Failure to Protect Claim

f. John Viviano (Individual Capacity) — **Count VI**- 42 U.S.C. § 1983 Deliberate Indifference Claim and **Count XVI-** 42 U.S.C. § 1983 Failure to Protect Claim

g. Ronald Hensley (Individual Capacity) — **Count VII**- 42 U.S.C. § 1983 Deliberate Indifference Claim, **Count XVII-** 42 U.S.C. § 1983 Failure to Protect Claim, and **Count XVIII-** 42 U.S.C. § 1983 Failure to Train Claim

h. Sheriff Grady Judd (Official Capacity) — **Count XIX-** 42 U.S.C. § 1983 Failure to Train Claim, **Count XX-** 42 U.S.C. § 1983 Policy Liability Claim, and **Count XXI** Wrongful Death Claim under Fla. Stat. § 768.28.

2. Summary Judgment is **DENIED** on **Counts XXII–XXVII** Wrongful Death Claims under Fla. Stat. § 768.28 against Sheriff Grady Judd (Official Capacity).

**DONE AND ORDERED** in Tampa, Florida, on July 11, 2025.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO**:
Counsel of Record